UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| STEPHANIE HIEN VY,<br>   Plaintiff,<br> v.<br>ANDREW SAUL,<br>   Defendant. | Case No. 18-cv-06031-RMI<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 19, 20, 21 |

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits under Title II. On February 2, 2016, Plaintiff filed her application for disability insurance benefits alleging an onset date of January 1, 2015. *See Administrative Record*[1] ("*AR*") at 574-76. The ALJ denied the application on August 15, 2017. *Id.* at 13-32. Plaintiff's request for review was denied by the Appeals Council on September 29, 2017 (*id.* at 1-7), and thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 8, 10), both parties have moved for summary judgment (dkts. 19, 20), and Plaintiff filed a reply (dkt. 21). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

**LEGAL STANDARDS**

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be

---

[1] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #12. *See* (dkts. 12-1 through 12-38).

conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff's application alleged disability due to low back pain, right shoulder pain, and anxiety. *AR* at 587. The ALJ found that Plaintiff's degenerative disc disease of the lumbar spine, right shoulder tendinosis, depression, anxiety, somatoform disorder, and breast cancer status post lumpectomy and radiation were severe. *Id*. at 19.

*Medical Evidence from Treating Providers*

Dr. Lornalyn Carillo referred Plaintiff to physical therapy ("PT") for low back pain in 2014, and Plaintiff began PT at Seton Medical Center Rehabilitation Services ("SMCR") on August 11, 2014. *AR* at 795. At that visit, Plaintiff reported left sided low back pain existing for one year, and her most recent flare up occurred two weeks prior to the appointment. *Id*. She stated that her pain was constant but worse with weight bearing on the left, rolling in bed, and bending movements. *Id*. Plaintiff also complained of numbness of the left leg to her ankle. *Id*. At that time, Plaintiff was working part-time serving coffee. *Id*. After eight appointments at SMCR, Plaintiff was referred back to Dr. Carillo and advised to seek a spine specialist for her continuing low back pain. *Id*. at 797.

On August 18, 2014, Plaintiff was admitted to the emergency room at Seton Medical Center ("SMC ER") for low back pain radiating to her feet since April. *Id*. at 751-58. A MRI

revealed "mild disc disease at L4-5 with a left posterolateral annular fissure and small annular disc bulge. No central stenosis. Mild right foraminal narrowing." *Id*. at 749. Dr. Carlos Zorrilla reported that there was "no evidence of spinal cord compression or cauda equina syndrome." *Id*. at 752. Plaintiff was prescribed pain medication. *Id*. Two days later, Plaintiff was hospitalized for "acute on chronic low back pain" and required an overnight stay. *Id*. at 762. On January 1, 2015, Plaintiff was once again admitted at SMC ER. *Id*. at 773-91. An X-Ray of the lumbosacral spine revealed "evidence of acute change and some degenerative changes mainly facet at L4-5." *Id*. at 773. The straight leg raise test for both lower extremities was normal, and there was mild tenderness over the lumbosacral area with mild muscle spasms. *Id*. at 774. Plaintiff received pain medication which reduced her pain but did not provide complete relief. *Id*.

On January 29, 2015, Plaintiff began treatment with Renata Jarosz, DO at the musculoskeletal clinic at San Mateo Medical Center. *Id*. at 725. Dr. Jarosz reported that Plaintiff's low back pain began approximately "6 years ago and has been excruciating since." *Id*. She noted that Plaintiff was "quite emotional/tearful throughout today's evaluation due to moderate level of pain and poor (pain related) ability to move, including standing, sitting, walking." *Id*. Plaintiff had an antalgic gait and was not able to perform a heel-toe, or tandem walking test, even with assistance, due to pain. *Id*. at 726. She had limited range of motion of the lumbar spine and tenderness over the L4-5 intradiscal space. *Id*. Plaintiff was unable to tolerate the seated straight leg raise test on the left.[2] *Id*. Plaintiff was also unable to "tolerate sitting for more than 10 min at a time and look[ed] for a comfortable position, attempting to transfer weight. This same applies to walking." *Id*. at 725. Dr. Jarosz reviewed Plaintiff's MRIs from April 18, 2014, and commented that they "demonstrate[] left L4-5 disc annular tear w/ HIZ[3] / disc content extrusion." *Id*. at 726. She added that "this can certainly explain [Plaintiff's] moderate to severe pain and lead to current depression/anxiety." *Id*.

---

[2] A seated straight leg raise test is a test used to evaluate compression of spinal nerves. *See* Seated Straight Leg Raising Test, Evidence Based Medicine Consult (March 20, 2020), https://www.ebmconsult.com/articles/straight-leg-raising-test

[3] Plaintiff added that HIZ stands for high intensity zone or "a bright area on an MRI often associated with annular tear herniation." *See* Pl.'s Mot. (dkt 19) at 7.

3

From March to July 2015, Plaintiff attended physical therapy, but she continued to have limited mobility due to her lower back pain. *Id*. at 798-803. On May 7, 2015, Dr. Henry Brodkin examined Plaintiff and noted a positive straight leg raise test on the left. *Id*. at 717. Plaintiff complained of left leg numbness. *Id*. She could barely stand on her heels and toes, and almost all motion of the spine produced pain. *Id*. Dr. Brodkin referred Plaintiff to neurosurgery because she was "incapacitated by pain into the left lower extremity, positive left seated straight leg raise on the left, pain on weight bearing on left, numb left lower extremity which has persisted for 6 years" without relief from conservative treatment which included pain medications and epidural injections. *Id*. at 718.

On May 10, 2015, Plaintiff went to the emergency room at San Mateo Medical Center for low back pain radiating to her left buttock and foot. *Id*. at 731-35. She followed up with Dr. Jarosz on May 27, 2015 after her first lumbar epidural injection which provided some temporary improvement, but the pain returned. *Id*. at 809. Plaintiff's physical exam revealed limited range of motion; tenderness to palpation over the L4-5 inner disc space; and decreased nerve reflexes of the left hip and leg. *Id*. at 810. Dr. Jarosz noted that Plaintiff did not find relief from PT, oral pain medications, topical agents, ice/heat modalities, and had minimal relief with transforaminal epidural steroid injections. *Id*. at 811. She performed trigger point injections at this visit. *Id*.

On July 3, 2015, Plaintiff began pain management treatment with Abhishek Gowda, MD. *Id*. at 1779. Plaintiff reported that trigger point injections by Dr. Jarosz and epidural steroid injections improved her pain. *Id*. Dr. Gowda noted that Plaintiff could not find a comfortable position sitting or standing, and Plaintiff stated that she cannot sit for more than 20 minutes before she experiences pain. *Id*. Plaintiff described the pain as sharp, stabbing, burning, and numbness of the left lower extremity. *Id*. On physical examination, Plaintiff had an antalgic gait, tenderness at L4 and L5, and the seated straight leg raise was positive on the left. *Id*. at 1780. Sensation was diminished to light touch at the left L4 and L5. *Id*. Dr. Gowda recommended Plaintiff follow up with Dr. Jarosz for injections; repeat MRI of the lumbar spine; wean off pain medications; and substitute new medications. *Id*. at 1781.

On July 8, 2015, Plaintiff had a follow up visit with Dr. Gowda for a treatment proposal.

*Id*. at 1777-78. Plaintiff was tearful due to her low back pain. *Id*. 1777. Dr. Gowda referred Plaintiff to Dr. Eliashof for interventions such as hypnosis and mindfulness, and highly recommended aquatic therapy. *Id*. at 1778.

Beginning in July of 2015, Dr. Melissa Fledderjohann, Ph.D., a pain psychotherapist, and Dr. Bruce Eliashof, MD, a pain psychiatrist, performed a detailed, multipart psychiatric intake evaluation. *Id*. at 1519-22; 1541-1550. Plaintiff had her first visit with Dr. Fledderjohann on July 3, 2015. *Id*. at 1546. Plaintiff reported that pain medications were not helpful and physical therapy caused her pain to increase, but she had some relief with epidural steroid injections. *Id*. Plaintiff reported that her pain was constant, and her pain level was a 7 out of 10, while her average pain level was 6 and, at its worst, was an 8. *Id*. Lying down, taking medications, and thinking about something else decreased her pain, but walking, exercising, and sitting increased her pain. *Id*. Plaintiff explained that she is unable to work or do household chores and must lie down every 15 minutes due to the pain. *Id*. at 1547. "She spends the majority of her day trying to get comfortable." *Id*. Plaintiff denied a history of depression and anxiety prior to living with chronic pain and stated that she had never received any psychiatric treatment. *Id*. She scored a 13/21 on the Hospital Anxiety and Depression ("HADS") scale for depression and a 15/21 for anxiety which indicated clinically elevated depression and anxiety. *Id*. at 1548. On the Pain Disability Index ("PDI"), Plaintiff obtained a score of 38/70 and considered herself totally disabled in two categories – family and home responsibilities and occupation. *Id*. Dr. Fledderjohann noted that Plaintiff was tearful throughout the evaluation and had to stand. *Id*. at 1549. Plaintiff's treatment plan consisted of the following: "1) weekly participation in [] Pain Management Group or individual pain education due to language barr[iers]; 2) weekly participation in group physical therapy; 3) medication changes, including reducing opioid use; [and] 4) individual pain psychiatry." *Id*. The psychological goals for Plaintiff were: "1) [r]eduction of fear avoidance of activity; 2) [r]eduction of depression and anxiety symptoms; 3) [i]ncreased self-management strategies for pain control; 4) [i]ncreased socialization; [and] 5) [p]repare her for readiness to return to work/volunteer work." *Id*. On July 8, 2015, Dr. Fledderjohann conducted the second part of the evaluation, and recommended Plaintiff attend group physical therapy in two weeks and

5

schedule individual psychiatric therapy appointments. *Id*. at 1545.

On July 28, 2015, Dr. Eliashof conducted the first part of Plaintiff's psychiatric evaluation. *Id*. at 1521-22. Plaintiff stated she had a 7-year history of back pain shooting into her left leg. *Id*. at 1521. The pain was "intermittent until the past 1 to 2 years when it became constant." *Id*. The pain is relieved by rest and lying down. *Id*. Throughout the visit, Plaintiff grimaced in pain and "need[ed] to stand up often to alleviate muscle cramping and pain." *Id*. Dr. Eliashof's impressions included chronic pain and depressed mood and sadness over loss of function. *Id*. On August 10, 2015, Dr. Eliashof conducted the second part of the evaluation. *Id*. at 1519-20. Plaintiff reported massage and epidural steroid injections helped the pain slightly, but she still struggled with pain and an inability to do things she liked to do. *Id*. 1519. Dr. Eliashof prescribed Cymbalta and ordered Plaintiff to follow up in 3 weeks. *Id*. at 1519.

Plaintiff saw Dr. Gowda on August 5, 2015. *Id*. at 1774-76. Plaintiff was doing well after an epidural steroid injection. *Id*. at 1774. Dr. Gowda reviewed a MRI of the lumbar spine performed on July 31, 2015 and noted L4-5 mild disc degeneration with small bulging left posterior protrusion, smaller than on the 2014 exam, and no spinal stenosis. *Id*. at 1775. Plaintiff was ordered to continue with medications, group therapy and individual therapy, and begin aquatic therapy. *Id*. at 1776.

From August of 2015 to May of 2016, Plaintiff had frequent visits for pain management therapies with Drs. Eliashof, Fledderjohann, Washburn, and Van De Water. *Id*. at 911-1378. Dr. Eliashof conducted weekly therapy sessions with Plaintiff and consistently diagnosed her with chronic pain. *Id*. at 1323-26; 1339-41; 1348-50; 1519-22. Dr. Fledderjohann and Dr. Washburn worked together to provide Plaintiff with individual pain management sessions. *Id*. at 1326-38; 1342-48; 1523-50; 1782-1872; 1892-1922. Dr. Emily Van de Water, PTD, conducted group physical therapy sessions. *Id*. at 1310-11; 1317-18.

On August 26, 2015, Dr. Gowda noted that Plaintiff's back pain appeared to improve. *Id*. at 1771. On physical exam, Plaintiff exhibited moderate to severe tenderness of the left lumbar and cervical paraspinal muscles; a positive Spurling's test on the left side of the neck; and decreased range of motion of the neck. *Id*. at 1772. Dr. Gowda recommended Plaintiff continue

with medications and physical therapy. *Id*. On September 1, 2015, Plaintiff began physical and aquatic therapy at Mills Health Center. *Id*. at 1506-10. She continued with therapy through January of 2017. *Id*. at 1471-72. Plaintiff consistently reported to have low back pain, and, as recent as January 13, 2017, she rated her pain at a 6 out of 10. *Id*. at 1472.

On March 30, 2016, Dr. Gowda performed a medical source statement. *Id*. at 891-96. He reported that Plaintiff could occasionally to frequently lift less than 10 pounds. *Id*. at 891. Plaintiff could stand and walk less than 2 hours in an 8-hour day. *Id*. She could sit or stand for 20 minutes before needing to change positions to relieve pain and needs "the opportunity to shift at will from sitting or standing/walking." *Id*. at 892. Plaintiff would also need to lie down at unpredictable intervals during a work shift approximately 1-2 times per day. *Id*. He reported that Plaintiff could occasionally crouch and climb stairs, but she could never twist, stoop, or climb ladders. *Id*. at 894. Plaintiff's ability to reach and push/pull were impaired due to her pain. *Id*. Dr. Gowda stated that the MRI of Plaintiff's lumbar spine, findings in physical therapy, and clinical exams support these limitations. *Id*. He noted, "[p]atient has pain with movement so exposure to [environmental] extremes could be dangerous, and exacerbate her symptoms." *Id*. at 896. Plaintiff was also limited due to pain from long distance ambulation, reaching, squatting, lifting, pushing and pulling. *Id*. Dr. Gowda anticipated Plaintiff's impairment would cause her to be absent from work more than three times a month. *Id*.

On January 18, 2017, Plaintiff's pain was stable, and she was attending a pain management clinic consistently. *Id*. at 1727. A month later, Plaintiff had another follow up visit with Dr. Gowda where she complained that her back and leg pain was getting worse. *Id*. at 1714. She had experienced severe pain down the left lower extremity over the previous month. *Id*. Dr. Gowda noted her "[f]unction [was] poor" and physical therapy was having little effect on her lumbar spine pain. *Id*. Plaintiff had a positive straight leg raise test on the left and tenderness to palpation at the left lumbar spine. *Id*. at 1715. Dr. Gowda recommended that if there was no improvement in Plaintiff's pain in the next two weeks, he would consider a referral for surgery. *Id*. at 1716.

*Medical Reports of Examining & Non-Examining Consultants*

On October 28, 2015, Dr. Calvin Pon performed a consultative orthopedic disability

7

evaluation at the request of the Social Security Administration. *Id*. at 828-31. Dr. Pon noted that Plaintiff had low back pain for approximately 6 years, and she complained of associated left lower extremity pain and numbness. *Id*. at 828. Plaintiff had a sitting tolerance of "approximately 15 to 20 minutes; standing tolerance 10 to 15 minutes; and walking tolerance approximately half a block." *Id*. Her gait was stable, but the velocity and stride length were less than normal, and she had a slight limp on the left; Plaintiff was able to squat 1/3 of the way down limited by low back pain and left lower extremity pain and numbness. *Id*. at 829. Dr. Pon noted that Plaintiff had a reduced range of motion; reduced motor muscle testing in the lower extremities due to pain; and a positive straight leg raise test both laying down and seated. *Id*. at 829-30. He diagnosed Plaintiff with chronic low back pain with left leg pain and numbness and probable lumbar disc disease with degenerative changes of the lumbar spine. *Id*. at 830-31. Plaintiff was weight bearing on her right leg and had a slight limp on the left, a positive straight leg raise test, and some atrophy of the left thigh. *Id*. Dr. Pon found that Plaintiff was limited to standing and walking for a total of 2 to 4 hours in an 8-hour day; sitting for 6 hours out of an 8-hour day; occasionally to frequently lifting 10 pounds; occasionally stooping and crawling; and rarely to occasionally climbing stairs, crouching, kneeling and squatting. *Id*.

Two agency consultants opined on Plaintiff's impairments. First, Dr. E.L. Gilpeer MD reviewed Plaintiff's medical records on December 7, 2015 and opined Plaintiff did not have a severe mental impairment but did have severe physical impairments due to degenerative disc disease of the low back. *Id*. at 486-92. He also opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of 6 hours in an 8-hour workday; and sit for a total of 6 hours in an 8-hour workday. *Id*. at 488-89. The following the postural limitations were noted: Plaintiff could occasionally climb ramps/stairs; climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl. *Id*. at 489. On June 6, 2016, a second non-examining consultant – C. Friedman MD – gave a medical opinion about Plaintiff's impairments. *Id*. at 494-506. Plaintiff had severe degenerative disc disease of the low back. *Id*. at 499. Dr. Friedman confirmed Dr. Gilpeer's determination about Plaintiff's limitations and residual functional capacity. *Id*. at 501-06.

*Function Reports*

On July 24, 2015, Plaintiff's husband, Ben Nguyen, submitted a function report. *Id*. at 606-14. He wrote that Plaintiff had back pain every day and "[s]he can't sit, stand or walk long." *Id*. at 606. Plaintiff cries and cannot concentrate because of her back pain and depression. *Id*. Because of constant pain and numbness, she can no longer cook for the family or run their coffee shop. *Id*. at 607. In addition, Plaintiff turns a lot in her sleep, stays in her pajamas rather than dress herself, cannot do housework, and can only drive short distances. *Id*. at 607, 609. Plaintiff only goes grocery shopping with her husband twice a week for about 20 minutes each time. *Id*. at 609.

Plaintiff's pain has affected her ability to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and follow instructions. *Id*. at 611. Plaintiff can walk 10 feet with her back brace on, must rest every 10 minutes, and needs her back brace daily which she received from the ER in 2014. *Id*. at 611-12.

*Hearing Testimony*

At the ALJ hearing on April 20, 2017, Plaintiff was not provided an interpreter although Plaintiff's non-attorney representative indicated one was required for the hearing. *Id*. at 428-29. The ALJ asked whether a continuance was necessary, but Plaintiff was eager to get the hearing done so they proceeded. *Id*. at 429. The Vocational Expert ("VE") was present by telephone throughout the hearing. *Id*. at 428.

Plaintiff testified that she had attained a ninth-grade education. *Id*. at 432; 453-54. Plaintiff's pain began in 2009, and she last worked in January of 2015 in a coffee shop that she owned with her husband. *Id*. at 432, 434. Plaintiff stated the coffee shop was open 7 days a week from 6 a.m. to 5 p.m., and she made sandwiches and coffee and sometimes worked as the cashier. *Id*. at 432-33. Plaintiff closed the coffee shop due to her back problems and difficulty walking and moving. *Id*. at 433.

Before owning the coffee shop, Plaintiff worked in a beauty salon as a manicurist. *Id*. at 435. She had also previously worked as a cashier at a restaurant where she took orders. *Id*. at 436. Plaintiff testified that she could not return to her previous jobs because of her low back pain that radiated to her left leg and foot with tingling sensation. *Id*. at 437. Plaintiff stated that she had pain

9

all the time and rated it at an 8 out of 10. *Id*. She has pain all the way up her leg and cannot walk well. *Id*. at 438. In 2015, her doctors advised that she may need surgery, but she declined the surgery because she did not have insurance. *Id*. at 438-39. Plaintiff received epidural injections, medications, physical therapy, and aquatic therapy with only minimal pain relief. *Id*. at 439-40.

Plaintiff could sit for about 10 to 15 minutes at a time and could walk only half a block due to the pain. *Id*. at 44. She tried to walk because her doctor recommended it, but it caused her pain. *Id*. at 442. Plaintiff testified that she began treatment with a team of doctors at a pain management clinic in 2015, and had appointments three times a week. *Id*. at 442-43. Physical therapy class would begin at 9 a.m. and continued for 2 hours followed by one hour of education about how to deal with pain. *Id*. at 444. She testified that at some appointments she had to lie down because she could not sit for long periods of time. *Id*. She sleeps 2-3 hours a night and when she gets up she has back pain and numbness of her hands. *Id*. at 445. Plaintiff testified that she cannot do housework like dusting, vacuuming, or mopping, and her husband and children performed the housework. *Id*. at 446. Plaintiff typically would not drive, except if her children needed her to take them to and from school which is 3 miles from her home. *Id*. Plaintiff lives in an upstairs apartment, and she can only walk halfway up and crawls the rest of the way. *Id*. at 447.

Plaintiff takes pain medication, but it makes her tired and dizzy and only relieves her pain for about 2 hours. *Id*. During her testimony, Plaintiff began having left leg pain and needed to elevate her leg on a chair. *Id*. at 448. She explained that she had to elevate her leg every time she is seated or lying down. *Id*. at 449. She stated that she is very depressed because she cannot do anything. *Id*. at 451.

Next, the ALJ posed hypotheticals to the VE. Plaintiff's past relevant work consisted of fast food cook; a sandwich maker; a waitress; a cashier; management in fast food; and a manicurist. *Id*. at 456. The first hypothetical supposed an "individual of the claimant's age, education, and work history" who "is limited to light exertional level and can stand and walk a total of four hours in an eight-hour day and sit for six; can occasionally stoop, crouch, kneel and squat; can occasionally climb stairs; and can never climb ladders; can occasionally crawl; and can frequently push with the let (sic) – push and pull with the left upper extremity; and can

10

occasionally push and pull with the left lower extremity; and can occasionally reach with the left per (sic) extremity." *Id*. at 457. The ALJ asked if such a person could perform any of the past relevant work described above. *Id*. The VE stated that only the manicurist job could be performed under the hypothetical standing and walking limitations, but the VE added that, based on his professional experience, small product assembler, collator, and information clerk in transportation were jobs that would accommodate the hypothetical limitations. *Id*. at 458-61. The ALJ's second hypothetical assumed an individual with the previous limitations "but also the limitation that they communicate with very little English," and the VE stated that all except for information clerk would be available. *Id*. at 461. The VE added that cleaner and polisher are jobs that would be available to such a person. *Id*. at 462.

The final hypothetical added the limitation that the individual would be absent from work three days per month. *Id*. at 466. The VE testified that none of the jobs would be available to such a person. *Id*. The ALJ had no further hypotheticals and asked Plaintiff's counsel if she had any questions for the VE. *Id*. at 467. Counsel asked to clarify whether the hypotheticals included limitations due to depression, and the ALJ responded that the limitation to simple, routine tasks was sufficient. *Id*.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. § 404.1505(a). The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 404.1520(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 404.1520(a)(4)). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation. *AR* at 16-26. At Step One, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since the alleged date the claimant became

11

disabled. *See* 20 C.F.R. § 404.1520(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 18.

At Step Two, the claimant bears the burden of showing that she has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine, right shoulder tendinosis, depression, anxiety, somatoform disorder, and breast cancer status post lumpectomy and radiation. *AR* at 19.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 404.1520(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. *AR* at 19-20. Next, the ALJ determined that Plaintiff retained the RFC to perform light work except she can stand and walk a total of 2-4 hours and sit a total of 6 in an 8-hour workday; occasionally stoop and crawl; rarely to occasionally climb stairs, crouch, kneel, and squat; never climb ladders; and can perform simple, routine tasks. *Id*. at 20-24.

At Step Four, the ALJ determined that Plaintiff was not capable of performing his past relevant work. *AR* at 24-25. Lastly, at Step Five, the ALJ concluded that based on the RFC, Plaintiff could perform the requirements of small product assembler, collater, and cleaner/polisher, and thus, had not been under a disability as defined in the Social Security Act, from January 1, 2015, through the date of the issuance of the ALJ's decision, August 15, 2017. *AR* at 25-26.

//

12

**DISCUSSION**

Plaintiff alleges the ALJ erred by: failing to call a medical advisor to establish the disability onset date; rejecting portions of Dr. Gowda's opinion; rejecting Plaintiff's testimony about the limiting effects of her symptoms; failing to consider all of Plaintiff's limitations in determining her RFC; and failing to include all of Plaintiff's limitations in the hypotheticals posed to the VE. Pl.'s Mot. (dkt. 19) at 20-30.

**A. Failure to Call a Medical Advisor to Establish Plaintiff's Disability Onset Date**

Plaintiff argues that the ALJ was required to call a medical advisor to establish her disability onset date because she had a chronic condition that worsened over time and that one agency physician – Dr. Greene – found she met an impairment listing. Pl.'s Mot. (dkt. 19) at 20-21. As Plaintiff points out, the ALJ rejected Dr. Greene's opinion because there was insufficient medical evidence to support that finding. *Id*. at 21. Defendant counters that "because the ALJ did not find Plaintiff disabled at any point," the ALJ was not required to call a medical advisor about her disability onset date. Def.'s Mot. (Dkt. 20) at 2. Plaintiff's argument that the ALJ erred by failing to call an expert to establish the onset date of her chronic low back pain misses the mark because the ALJ did not infer the onset of a disabling impairment.

When the medical evidence is unclear about the disability onset date, the ALJ may only make inferences about the onset date based on "the informed judgment of the facts in the particular case. This judgment . . . must have a legitimate medical basis." *Morgan v. Sullivan*, 945 F.2d 1079, 1082 (9th Cir. 1991). Thus, in order to make an inference regarding disability onset date, the ALJ is required to call on a medical advisor to form the requisite legitimate basis. *See id*.

Plaintiff relies on *DeLorme v. Sullivan*, 924 F.2d 841 (9th Cir. 1991) for the proposition that the ALJ did not have the requisite "legitimate medical basis" for determining her disability onset date. In *DeLorme*, the court found that the ALJ erred in failing to call an expert because medical reports indicated the claimant suffered mental impairments that "would have met the criteria set forth in the Listing of Impairments, depending on the duration of his mental problems." *Id*. at 847. The claimant had one comprehensive report of depression, but a number of earlier medical records pertaining to his back problems mentioned depression. *Id*. at 844. Based on the

13

1  sporadic yet repeated documentation of depression, the ALJ in *DeLorme* was required to call a
2  medical advisor to ascertain the onset date. Here, on the other hand, Plaintiff presented medical
3  records spanning from 2014 to 2016. The question for the ALJ was not when Plaintiff's low back
4  pain became disabling, but rather, whether Plaintiff's low back pain was disabling or not. Thus, it
5  was not necessary for the ALJ to call a medical expert to determine the onset date.

### B. Rejecting Portions of Dr. Gowda's Opinion

Plaintiff's second argument is that the ALJ failed to give specific and legitimate reasons for rejecting the opinion of Dr. Gowda – Plaintiff's treating physician – about Plaintiff's functional limitations. Pl.'s Mot. (dkt. 19) at 21-24. Although the ALJ summarized a good deal of the medical record, Plaintiff argues that the ALJ did not identify conflicting evidence and did not properly weigh Dr. Gowda's medical opinion. *Id*. at 23-24. Defendant argues that the ALJ provided specific and legitimate reasons by citing to medical evidence which supported Plaintiff's limitations as well as records that showed instances of normal physical exams and mild to moderate diagnostic studies. Def.'s Mot. (dkt. 20) at 3-5.

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant . . . [T]he Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222 (9th Cir. 2010) (quoting *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)). The reason that an ALJ must accord special weight to a treating physician's opinion is that a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). If a treating source's opinions on the issues of the nature and severity of a claimant's impairments are well-supported by medically acceptable clinical and laboratory diagnostic techniques, and are not inconsistent with other substantial evidence in the case record, the ALJ must give it "controlling weight." 20 C.F.R. § 404.1527(c)(2). However, if the treating physician's opinion is contradicted by another physician, such as an examining physician, the ALJ may reject the treating physician's opinion by providing specific, legitimate reasons, supported by substantial evidence in the record. *Id.* at 830-31; *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007);

*Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

Here, the ALJ assigned only "some weight" to Dr. Gowda's medical opinion about Plaintiff's limitations while assigning "great weight" to Dr. Pon's medical opinion. *AR* at 23-24. In rejecting parts of Dr. Gowda's opinion, the ALJ stated "the medical evidence as a whole, as already discussed above, does not support the more extreme limitations that [Dr. Gowda] found (i.e. lifting and carrying less than 10 pounds, standing and walking no more than 2 hours, likely to be absent more than 3 times per month)." *AR* at 24. The ALJ stated that Dr. Pon's opinion was "wholly consistent with the medical evidence of record, including the diagnostic studies and objective findings from various treating physicians which document some tenderness and reduced range of motion in the lumbar spine." *Id*. at 23.

There are several defects with the ALJ's explanation. First, Dr. Gowda had a close working relationship with the other "various treating physicians" as they worked at the same medical clinic and collaborated with one another regarding Plaintiff's treatment. *Id*. at 1702-1882. Moreover, Dr. Gowda had monthly follow-up visits with Plaintiff for more than a year. *Id*. at 1702-81. Dr. Pon evaluated Plaintiff one time on October 28, 2015. *Id*. at 828-33. Second, the ALJ stated that "the medical evidence as a whole" did not support some of Dr. Gowda's opinion but failed to identify specific conflicting facts or clinical evidence. In fact, the ALJ's summation of the medical evidence revealed consistent diagnostic exam results and physical exams. For example, two MRIs of Plaintiff's lumbar spine, one performed in August of 2014 and the other performed in July of 2015, revealed mild disc disease at L4-5. *Id*. at 21-22. Additionally, Dr. Pon's physical examination of Plaintiff did not conflict with Dr. Gowda's – both of which were performed in October of 2015. *Id*. at 828-33, 1765-67. The two physicians found Plaintiff had low back pain that radiated down the left leg and a positive straight leg raise test on the left. *Id*. at 830-31, 1765-67. Where a treating physician's opinion is contradicted by an examining professional's opinion, the ALJ may resolve the conflict by relying on the examining physician's opinion if the examining physician's opinion is supported by different, independent clinical findings. *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *Orn*, 495 F.3d at 632; *see also Bayliss*, 427 F.3d at 1216 (if an examining physician's opinion is contradicted by another physician's opinion, an ALJ

15

must provide specific and legitimate reasons to reject it). "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" *Orn*, 495 F.3d at 632. Thus, the ALJ failed to provide specific, legitimate reasons supported by substantial evidence to justify rejecting Dr. Gowda's medical opinion.

### C. Rejecting Plaintiff's Testimony Concerning Intensity, Persistence, and Limiting Effects of Symptoms

Plaintiff argues that the ALJ improperly rejected Plaintiff's testimony concerning intensity, persistence, and limiting effects of symptoms, and thus the ALJ's decision lacks the support of substantial evidence. Pl.'s Mot. (dkt. 19) at 24-27. Defendant argues that the ALJ properly rejected Plaintiff's testimony because the ALJ provided legally sufficient reasons and only discounted aspects of Plaintiff's testimony that alleged greater limits than Plaintiff's RFC. Def.'s Cross Mot. (dkt. 20) at 5-6. The ALJ stated that Plaintiff's allegations were "out of proportion with the diagnostic studies" and several providers' notes stated Plaintiff "engaged in dramatic pain behavior." *AR* at 23.

The assessment of a claimant's credibility regarding the intensity of symptoms requires an ALJ to engage in a two-step analysis. *See Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). Initially, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Ghanim*, 763 F.3d at 1163 (quoting *Vasquez*, 572 F.3d at 591). If the claimant satisfies the first test, and there is no evidence of malingering, the ALJ can then reject a claimant's symptom testimony by giving specific, clear and convincing reasons for the rejection. *Id.*; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). General findings, therefore, will not suffice and an ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Ghanim*, 763 F.3d at 1163; *see also Lester*, 81 F.3d at 834.

Here, because there was no evidence of malingering, the Plaintiff's testimony regarding the

16

intensity of her symptoms could not be rejected without providing specific, clear, and convincing reasons based on substantial evidence. The ALJ's explanation failed to satisfy that standard. First, the ALJ does not specifically identify which portions of Plaintiff's testimony were being rejected as not entirely consistent with the record. Instead, the ALJ stated that Plaintiff's "statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical evidence." *Id*. at 21. For instance, it is unclear if the ALJ rejected Plaintiff's testimony that she could not sit for more than 10 to 15 minutes and could only walk a half of a block at a time (*id*. at 441); or that halfway to her upstairs apartment Plaintiff must crawl because she cannot walk anymore (*id*. at 447).

Second, the ALJ did not provide clear and convincing reasons to reject Plaintiff's testimony. Instead, the ALJ summarized years of medical treatment and diagnostic studies which showed Plaintiff suffers from chronic low back pain and degenerative disc disease along with clinical findings of positive straight leg raise tests and loss of sensation in the leg and foot. *Id*. at 21-23. The ALJ, however, pointed to a single note by Dr. Washburn which stated that Plaintiff's pain was out of proportion to physical findings. *Id*. at 23, 2250. The ALJ also mentioned other medical records which showed Plaintiff having emotional reactions to various events in the presence of physicians (e.g. when recalling her journey from Cambodia and her relationship with her husband; or when stitches were removed from her leg). *Id*. at 23. However, the medical evidence, as recited by the ALJ, shows Plaintiff suffered for years from L4-5 mild disc disease, made several emergency room visits, and underwent prolonged and aggressive pain management treatments including physical therapy, epidural injections, pain medications, and psychotherapy – all of which provided little to no relief. *Id*. at 21-23.

The court finds that the ALJ's rejection of some unspecified portions of Plaintiff's testimony was inherently erroneous. Although the ALJ identified some evidence that could tend to undermine Plaintiff's credibility about the intensity of her pain, the decision lacked enough specificity for this court to determine exactly what testimony was rejected and why. Thus, the ALJ erred in rejecting Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her symptoms.

17

**D. Failure to Consider All of Plaintiff's Limitations in Determining RFC**

Plaintiff argues that the ALJ erred in determining her RFC because it did not include her non-severe impairments (e.g. changing pain level, emotional instability, social limitations, and education). Pl.'s Mot. (dkt. 19) at 27-29. Defendant argues that the ALJ's RFC finding was proper because the RFC assesses a claimant's functional capabilities, not education level; the RFC adequately accounted for difficulties in adaptation and self-management; and mild social limitations were not necessary to the RFC assessment. Def.'s Mot. (dkt. 20) at 6-7.

At Step 3, the ALJ found only "mild limitations in understanding, remembering, or applying information; mild limitation in interacting with others mild limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself." *AR* at 19. Additionally, the ALJ found that the record did not show that Plaintiff had only a minimal capacity to adapt to environment or demands not part of Plaintiff's regular life. *Id*. at 19-20. The ALJ found Plaintiff could perform simple, routine tasks. *Id*. at 20.

An ALJ is required to consider non-severe as well as severe impairments when assessing a claimant's RFC. *See Celaya v. Halter*, 332 F.3d 1177, 1181 (9th Cir. 2003). "The ALJ must consider a claimant's physical and mental abilities, § 416.920(b) and (c), as well as the total limiting effects caused by medically determinable impairments and the claimant's subjective experiences of pain, § 416.920(e)." *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014). "[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008).

First, the ALJ was not required to consider Plaintiff's education level to determine her RFC. Second, the ALJ's restriction to simple, routine tasks adequately addressed Plaintiff's restrictions regarding concentration, persistence, and pace. However, the ALJ erred in assessing the medical evidence, specifically the rejection of Plaintiff's treating provider, and thus, failed to consider all the relevant medical evidence and restrictions stated therein. Thus, the court finds that the ALJ erred by making the above-mentioned errors.

//

**E. Failure to Include All of Plaintiff's Limitations in Hypotheticals to VE**

Finally, Plaintiff submits that the ALJ erred by failing to include all of Plaintiff's limitations in the hypothetical questions, rendering the VE's opinion incomplete. Pl.'s Mot. (dkt. 19) at 29-30. Plaintiff, however, only points to her educational limits in making this argument. *Id*. at 29. Defendant counters that the ALJ properly relied on the VE's testimony because the hypotheticals were based on Plaintiff's vocational profile and RFC. Def.'s Mot. (dkt. 20) at 8-9. The VE was present by phone for the entire hearing, and as such, he heard the ALJ question Plaintiff about her level of education on two instances (*see AR* at 432, 453-54), and the ALJ's hypotheticals to the VE supposed an individual of Plaintiff's education level (*id*. at 457). Thus, Plaintiff's argument that the ALJ did not consider her education level is without merit. However, on remand, the ALJ should address why she rejected Dr. Gowda's opinion that Plaintiff would be absent from work 3 times per month because the VE testified that no jobs would be available to a person who would be absent three days per month (*id*. at 466).

## CONCLUSION

For the reasons stated above, the court **GRANTS** Plaintiff's motion for summary judgment, **DENIES** Defendant's motion for summary judgment, and **REMANDS** the case for further proceedings in accordance with the guidance provided herein.

A separate judgment will issue.

**IT IS SO ORDERED.**

Dated: March 23, 2020

ROBERT M. ILLMAN
United States Magistrate Judge